RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

*Filed 2/3/2005*

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

v.

FLOYD BRUCE,

    *Defendant-Appellant.*

No. 03-3110

FOR YOUR INFORMATION

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 02-00029—Sandra S. Beckwith, Chief District Judge.

Argued: August 3, 2004

Decided and Filed: February 3, 2005

Before: NELSON and COOK, Circuit Judges; ROSEN, District Judge.[*]

---

## COUNSEL

**ARGUED:** J. Vincent Aprile II, LYNCH, COX, GILMAN & MAHAN, Louisville, Kentucky, for Appellant. Timothy D. Oakley, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee. **ON BRIEF:** J. Vincent Aprile II, LYNCH, COX, GILMAN & MAHAN, Louisville, Kentucky, for Appellant. Timothy D. Oakley, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

ROSEN, D. J., delivered the opinion of the court, in which NELSON, J., joined. COOK, J. (p. 20), delivered a separate concurring opinion.

---

[*]The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

## OPINION

ROSEN, District Judge.

### I. *INTRODUCTION*

Defendant/Appellant Floyd Bruce was charged in a four-count indictment with three counts of bank fraud in violation of 18 U.S.C. § 1344 and one count of unauthorized use of an access device in violation of 18 U.S.C. § 1029(a)(5). The bank fraud charges arose from Defendant's alleged use of false identification and fraudulent credit cards to obtain funds from three different banks, while the remaining charge rested upon Defendant's alleged use of a credit card issued under a false name to obtain cash and merchandise of value exceeding $1,000 during a one-year period. All of these charges were based largely upon evidence found in a search of hotel rooms rented by Defendant at the time of his arrest.

On June 10, 2002, Defendant appeared before District Judge Sandra S. Beckwith and entered a plea of guilty to the bank fraud charge set forth in count one of the indictment. As stated in his plea agreement, Defendant understood that he was pleading guilty to an offense which carries a maximum term of imprisonment up to 30 years, a fine of up to $1,000,000, and a three-year period of supervised release. However, Defendant reserved his right to appeal the district court's denial of his motion to suppress the evidence seized from him and his hotel rooms at the time of his arrest. In exchange for Defendant's guilty plea, the Government agreed to dismiss the remaining counts of the indictment, and also recommended that Defendant be given "the appropriate reduction for acceptance of responsibility, pursuant to United States Sentencing Guideline § 3E1.1(a)." (Plea Agreement at ¶¶ 2, 5, J.A. at 31-32.)

At sentencing on January 17, 2003, the district court imposed a 33-month term of imprisonment followed by a five-year period of supervised release. This sentence incorporated a two-level increase for obstruction of justice, based upon the district court's finding that Defendant had misstated his true citizenship during a presentence investigation interview. In addition, the district court declined to grant a reduction for acceptance of responsibility as recommended in the plea agreement.

Defendant now appeals the denial of his motion to suppress, the sentence enhancement for obstruction of justice, the district court's refusal to grant a reduction for acceptance of responsibility, and the U.S. Attorney's purported violation of the plea agreement by standing silent at sentencing on the matter of acceptance of responsibility. We find no merit in these challenges, and therefore affirm Defendant's conviction and sentence.

### II. *FACTUAL AND PROCEDURAL BACKGROUND*[1]

On October 23, 2000, Defendant/Appellant Floyd Bruce, using the name "Vincent Larue," and his traveling companions, Dennis Ritter and Carisse Coleman, checked into the Extended Stay America hotel in Blue Ash, Ohio. They paid for their one-week rental in cash. Defendant was listed

---

[1]Notably, while Defendant challenges the district court's denial of his motion to suppress, and while both sides cite to testimony and evidence presented at the hearing on this motion, the underlying transcript of this suppression hearing was not included in the joint appendix provided by the parties on appeal. Nonetheless, we have obtained a copy of the transcript of this May 30, 2002 hearing, and have confirmed that it is consistent with the facts as set forth in the parties' briefs on appeal and in the district court's order denying Defendant's motion to suppress.

as the renter of room 316 and Ritter was recorded as the renter of room 320, but Defendant slept in room 320 with Ritter while Coleman stayed in room 316. Defendant testified that he paid for room 316, gave Ritter the money to rent room 320, and had keys to both rooms.

On October 25, 2000, the hotel manager contacted the Blue Ash Police Department ("BAPD") to report that hotel employees had detected the smell of burning marijuana in the hotel's third floor hallway and suspected it was coming from either room 316 or room 320. At the request of BAPD Sergeant Ed Charron, and in accordance with a hotel interdiction program operated in cooperation with the local police, the hotel manager directed the cleaning crew to save, separately secure, and mark the trash bags obtained from both rooms.[2]

The parties dispute the circumstances that surrounded this trash collection effort. According to Sergeant Charron's testimony at the suppression hearing, he instructed the hotel manager to speak to the cleaning personnel and direct them to obtain and segregate the trash bags during their regular cleaning of the two rooms. Sergeant Charron further testified that he told the hotel manager not to pick up the trash if there was a "Do Not Disturb" sign on the doors to the rooms.[3] Defendant testified, however, that he specifically recalled placing "Do Not Disturb" signs on the doors to both rooms on October 25 and 26, 2000, and he denied giving permission for hotel staff to clean either of the rooms on these two days. Defendant also produced an affidavit from the hotel's assistant manager stating that the hotel's cleaning policy prohibits the cleaning of rooms with "Do Not Disturb" signs unless management obtains the guest's permission.[4]

In any event, the cleaning staff saved and marked the trash bags from rooms 316 and 320 in accordance with the BAPD's request. In the trash taken from room 316, the police found a partial marijuana cigarette. In the trash removed from room 320, the police found some loose tobacco and a hollowed-out cigar.[5] In addition, police investigation revealed a discrepancy between the name listed on Defendant's rental car application (Alvazo Gregory) and the actual registrant of the driver's license used to rent the car (Richard Grant) — and, of course, neither of these names matched the names given by Defendant and his companions when registering at the hotel. Based on these facts, as well as the payment for the room in cash, the police sought and obtained a search warrant from a municipal court judge to search rooms 316 and 320 of the hotel for evidence of illegal drugs, papers showing ownership and/or control of such drugs, articles used in the preparation of such drugs for distribution, and any proceeds obtained through such distribution.

While Sergeant Charron was en route to apply for this search warrant in the afternoon or early evening of October 26, 2000, Defendant and Ritter were seen exiting the hotel. They were detained by other officers while Sergeant Charron obtained the warrant and the two rooms were searched. While detaining the two men, the officers discovered that Defendant had $7,004 in cash and Ritter had $1,220 in cash.

---

[2] Under the interdiction program, hotel employees can earn a reward for assisting the police, and a reward apparently was paid to a hotel employee in this case.

[3] Although Sergeant Charron testified on direct examination that the hotel interdiction program itself includes a written guideline specifying that trash collection is to be done only as part of the regular cleaning routine, he conceded on cross-examination that the written policies actually do not address the subject of trash collection.

[4] Neither party called the hotel's cleaning staff as witnesses, so there is no direct evidence as to whether these employees observed "Do Not Disturb" signs hanging on the doors to the rooms or whether they entered the rooms despite the presence of these signs.

[5] The district court observed that marijuana users sometimes use a hollowed-out cigar to smoke marijuana in lieu of other paraphernalia.

In Room 316 — the room rented by Defendant, but apparently used by Coleman — the police found a torn-up loan application in a cup and what appeared to be marijuana seeds and stems. In Room 320 — the room rented to Ritter, and occupied by Defendant and Ritter — the officers found three MasterCard credit cards in the names of "Gregory Alvazo," "Mario Fuentes," and "Anneliso Blane," and a Discover card in the name of "Kirsten Sembeck England." The police also found two driver's licenses in this room: a New York driver's license bearing Defendant picture under the name "Gregory Alvazo," and a Texas driver's license bearing Defendant's photo under the name of "Mario Fuentes."[6] These items were found inside an envelope, which in turn was inside of Ritter's garment bag. In addition, the search of room 320 revealed a cashier's check in the amount of $7,500 made payable to "Mario Fuentes."

Based on these discoveries, the police obtained a second search warrant to search rooms 316 and 320 and seize false or forged driver's licenses, identification cards, credit cards, and the proceeds gained from the use of these false documents. In support of this warrant application, the officers cited an Ohio statute outlawing forgery. Pursuant to this warrant, the officers seized the above-cited identification documents, credit cards, and cashier's check, and this in turn led to a state court indictment charging Defendant with three counts of forgery and three counts of possession of criminal tools. Subsequently, Defendant was named in the April 3, 2002 four-count federal indictment in this case, with the charges all stemming from the false identification and credit cards found in the hotel room.

By motion filed on May 10, 2002, Defendant sought to suppress the evidence obtained in the search of the hotel rooms. The district court held a hearing on this motion on May 30, 2002, and issued an order denying the motion on June 7, 2002. Defendant then entered a guilty plea to Count One of the indictment on June 10, 2002, while reserving the right to appeal the denial of his motion to suppress. Under the parties' plea agreement, the Government agreed to dismiss the remaining counts of the indictment, and also recommended, in light of Defendant's "voluntary and truthful admission to authorities of his involvement in the instant offense," that Defendant "be given the appropriate reduction for acceptance of responsibility." (Plea Agreement at ¶¶ 2, 5, J.A. at 31-32.)

In an interview with a probation officer during the ensuing presentence investigation, Defendant claimed that he had become a naturalized United States citizen in 1991. Upon being confronted with documentation refuting this claim, however, Defendant asserted that he was a citizen of Bermuda. The probation officer was unable to confirm this latter claim in the course of the presentence investigation — to the contrary, some information indicated that Defendant was not a Bermudian citizen, and that Floyd Bruce might not be his true name. Thus, the probation officer concluded in his final presentence investigation report that Defendant's "true citizenship is unknown," and he recommended that Defendant be given a two-level sentence enhancement for obstruction of justice.

At a sentencing hearing held on January 17, 2003, the district court adopted the recommendation that Defendant's offense level be enhanced under the U.S. Sentencing Guidelines for obstruction of justice. In light of this enhancement and other considerations, the district court further concluded that Defendant was not entitled to the acceptance-of-responsibility reduction that the Government had recommended in the plea agreement. Accordingly, the court arrived at a sentencing range of 27 to 33 months, and it elected to impose a 33-month term of imprisonment, followed by a five-year period of supervised release. This appeal followed, challenging the denial of Defendant's motion to suppress, and also challenging certain events and rulings at sentencing.

---

[6] At the suppression hearing, Defendant testified that he had given this envelope to Ritter for safekeeping.

### III. *ANALYSIS*

Defendant has raised four issues on appeal: (i) whether the district court properly denied his motion to suppress; (ii) whether the district court properly applied a two-level enhancement to Defendant's sentence for obstruction of justice; (iii) whether Defendant should have been deemed eligible for a reduced sentence for acceptance of responsibility; and (iv) whether the U.S. Attorney breached a material term of Defendant's plea agreement by failing to recommend at sentencing that Defendant be given a sentence reduction for acceptance of responsibility. In addition, the parties were invited shortly before oral argument to submit supplemental briefs regarding the possible impact of the Supreme Court's recent decision in *Blakely v. Washington,* 124 S. Ct. 2531 (2004). We address each of these matters in turn.

**A.    The District Court Did Not Err in Denying Defendant's Motion to Suppress.**

As his first issue on appeal, Defendant challenges the district court's denial of his motion to suppress the evidence seized from rooms 316 and 320 of the Extended Stay America hotel in Blue Ash, Ohio at the time of his arrest on October 26, 2000. "In reviewing a district court's determination on suppression questions, a district court's factual findings are accepted unless they are clearly erroneous." *United States v. Martin,* 289 F.3d 392, 396 (6th Cir. 2002) (internal quotation marks and citations omitted). "A factual finding will only be clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. Johnson,* 242 F.3d 707, 709 (6th Cir.), *cert. denied,* 534 U.S. 863 (2001). The district court's rulings on questions of law, in contrast, are reviewed *de novo* on appeal. *Martin,* 289 F.3d at 396.

**1.    The Removal of Trash by the Hotel's Cleaning Staff Did Not Violate Any Protected Fourth Amendment Privacy Interest.**

The starting point of Defendant's argument on appeal is that the hotel cleaning staff were acting as agents of the local Blue Ash police when they removed the trash from rooms 316 and 320 of the Extended Stay America hotel. In Defendant's view of the evidence, he had established a constitutionally protected privacy interest in these rooms by posting "Do Not Disturb" signs on the doors. Thus, he contends that the government and its agents, the hotel staff, violated his Fourth Amendment rights by entering the rooms and taking the trash without a warrant. Absent the fruits of this purportedly illegal search and seizure, Defendant argues that the warrant subsequently obtained by the police to search the hotel rooms was not supported by probable cause. We conclude on two separate grounds, however, that the cleaning staff's collection of the trash did not run afoul of the Fourth Amendment.

The Fourth Amendment, of course, "proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government." *United States v. Lambert,* 771 F.2d 83, 89 (6th Cir.), *cert. denied,* 474 U.S. 1034 (1985). "A person will not be acting as a police agent merely because there was some antecedent contact between that person and the police." *Lambert,* 771 F.2d at 89. Rather, two elements must be shown in order to treat ostensibly private action as a state-sponsored search: (1) the police must have instigated, encouraged, or participated in the search; and (2) the private individual must have engaged in the search with the intent of assisting the police. *Lambert,* 771 F.2d at 89. Regarding this latter element of intent, we have explained that a private party is not an agent of the government where "the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution." *United States v. Howard,* 752 F.2d 220, 227 (6th Cir.), *vacated on other grounds,* 770 F.2d 57 (6th Cir. 1985); *see also United States v. Foley,* 23 F.3d 408, 1994 WL 144445, at *2 (6th Cir. Apr. 21, 1994) ("[I]f the intent of the private party conducting the search is independent of the official desire

to collect evidence in a criminal proceeding, then the private party is not acting as a state agent."), *cert. denied*, 513 U.S. 938 (1994).

Here, we doubt that either prong of the *Lambert* test has been satisfied. First, the hotel cleaning staff did not engage in any sort of "search" of the trash gathered from rooms 316 and 320, whether at the encouragement of the police or otherwise. Rather, these employees merely were asked to separately maintain and mark any trash bags they removed during their routine cleaning of the rooms, so that the *police* could then search them. Stated differently, the cleaning staff were not asked to *search* for evidence, but merely to *preserve* any possible evidence they might otherwise have removed from the room and discarded in the course of their ordinary cleaning duties. There is no evidence that the staff were asked to look around the rooms, report any suspicious items, or otherwise deviate from their typical cleaning routine. It also is worth noting that hotel employees initiated contact with the police, and not vice versa, based on their detection of an apparent marijuana smell emanating from one of the two rooms rented by Defendant and his travel companions.

Next, whatever motive or incentive the hotel employees might have had to assist the police in detecting unlawful activity in rooms 316 and 320, they undoubtedly had the distinct and independent intent — and, indeed, the obligation — to clean these rooms and empty their trash, just as they would do with any other room in the hotel. If the police had not contacted them, the cleaning staff surely would have entered the two rooms and removed the trash bags in any event. These private employees are not transformed into government agents merely because the police took an interest in the items they planned to remove from the room during their normal cleaning activities, nor does any additional monetary or public-minded incentive detract from their independent obligation to remove trash from guest rooms. Indeed, if compliance with a police request would have required the cleaning staff to violate a hotel policy, these employees would have been forced to weigh the modest reward for police cooperation against the significant sanction of discipline or discharge by hotel management.

Accordingly, because the cleaning staff were acting as private individuals and not government agents, it is immaterial whether "Do Not Disturb" signs had been placed on the doors of rooms 316 and 320. Any transgression of hotel policy in this regard does not give rise to a constitutional violation. We have recognized, for example, that the government may use information obtained in a private search "even if the private party betrayed a confidence in providing the information to the government." *United States v. King*, 55 F.3d 1193, 1196 (6th Cir. 1995). Similarly, we have held that a motel manager's two searches of a guest room, though "probably violations of state trespass laws," did not implicate the Fourth Amendment prohibition against unreasonable searches, and that "the police were entitled to employ the evidence uncovered by these two searches." *United States v. Nelson*, 459 F.2d 884, 887 (6th Cir. 1972). It follows in this case that any purportedly improper entry into Defendant's hotel room by private hotel employees did not violate his rights under the Fourth Amendment.

Yet, even if the hotel cleaning staff were deemed government agents, we are not persuaded that Defendant has established a reasonable expectation of privacy that would permit him to challenge the search of the trash bags collected from rooms 316 and 320. The courts have recognized that hotel guests ordinarily have a protected Fourth Amendment privacy interest in their rooms. *Hoffa v. United States*, 385 U.S. 293, 301, 87 S. Ct. 408, 413 (1966); *United States v. Allen*, 106 F.3d 695, 698 (6th Cir.), *cert. denied*, 520 U.S. 1281 (1997). On the other hand, there normally is no privacy interest in trash placed outside a residence for collection. *See California v. Greenwood*, 486 U.S. 35, 40-41, 108 S. Ct. 1625, 1628-29 (1988). When trash leaves the owner's control and is put out for collection, anyone is free to rummage through it, whether for an investigative or any other purpose. *Greenwood*, 486 U.S. at 40, 108 S. Ct. at 1628-29. "What a person knowingly

exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511 (1967).

Similar to trash being put out for collection and thereby leaving the owner's control, one can reasonably assume that items placed into a hotel room trash bin will be picked up and taken away by the hotel's cleaning personnel. Here, of course, if Defendant's testimony is credited on this point, he arguably went to greater lengths to shield his privacy by placing "Do Not Disturb" signs on the doors of the two rooms. Yet, the district court expressly found that Defendant was not a credible witness on this subject, and concluded that no such signs were present when hotel staff arrived to clean the rooms in accordance with their ordinary practice. (*See* District Court 6/7/2002 Order at 7-8, J.A. at 199-200.) Under this assessment of the evidence, which we are bound to accept unless it is clearly erroneous, Defendant cannot claim a legitimate expectation of privacy in any items discovered in the trash.

Defendant contends that the district court clearly erred in two respects, however: by citing purportedly invalid reasons for discounting Defendant's own testimony, and by instead relying upon the testimony of Sergeant Charron to find that no signs were present on the hotel room doors. Regarding the latter, Defendant claims that Sergeant Charron contradicted himself when he testified on direct examination about a written policy mandating that trash be collected only during routine cleaning, but then conceded on cross-examination that no such written policy existed. In light of this discrepancy, Defendant takes issue with the district court's finding that the Sergeant's testimony was "forthright and consistent." (District Court 6/7/2002 Order at 7, J.A. at 199.)

On the other side of the balance, Defendant challenges the district court's stated grounds for discounting his credibility. This argument rests on the following exchange during the cross-examination of Defendant at the suppression hearing:

Q:   Mr. Bruce, what were you doing in Cincinnati?

A:   We had come to Cincinnati on a social visit, sir.

Q:   To see whom?

A:   Ms. Carisse Coleman has family here in Cincinnati. And I and Dennis [Ritter] took the opportunity to accompany her down here, sir.

Q:   So she is a local girl?

A:   I would believe she lived here at this point, but I had met her in New York.

Q:   And she has family here?

A:   I wouldn't know that information.

Q:   You just told us that you thought she had family here, you were here to visit family?

A:   I said we had come here on a social visit, sir.

Q:   And I asked you why the social visit and you said to see Carisse Coleman's family?

A:   I said Carisse is from here. Okay. I'm not very familiar with Cincinnati, she is. And I believe she came here to see her friends.

Case 1:02-cr-00029-SSB   Document 48   Filed 02/03/2005   Page 8 of 20

(5/30/2002 Suppression Hearing Tr. at 77-78.) Based on this testimony, the district court found that Defendant "had no credible explanation for his presence in Blue Ash." (District Court 6/7/2002 Order at 7, J.A. at 199.) Defendant, in contrast, construes this testimony as consistently citing a "social visit" as his reason for traveling to the Cincinnati area.

The district court's assessments of the credibility of Defendant and Sergeant Charron were not clearly erroneous. "[T]he District Court [i]s in the best position to judge credibility," and when "that Court plausibly resolve[s] the discrepancies in the testimony, its findings of fact should not be disturbed." *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996), *cert. denied*, 520 U.S. 1178 (1997). Apart from noting the evident inconsistency in Defendant's shifting account of his reason for being in Blue Ash, the district court cited other factors in discounting Defendant's credibility, including: (1) that Defendant was a convicted felon who had an incentive to fabricate testimony in order to evade the charges against him; and (2) that Defendant was in possession of at least three driver's licenses bearing his likeness but using different names or aliases. As the district court aptly observed, "[m]ost honest people find that they do not need aliases and can navigate through life quite nicely with only one driver's license showing their real name." (District Court 6/7/2002 Order at 7, J.A. at 199.) These all are legitimate grounds for discounting the credibility of a witness, and each was sufficiently rooted in the evidentiary record.

Likewise, we find no basis to disturb the district court's finding that Sergeant Charron testified credibly about the instruction he gave to the hotel manager — namely, that the cleaning staff should collect the trash from rooms 316 and 320 only during their ordinary cleaning routine. The sole ground suggested by Defendant for discounting this testimony is that the Sergeant purportedly had to "disavow" his testimony regarding written guidelines for trash collection when, on cross-examination, he was confronted with the written policy and acknowledged that it did not touch upon the subject of trash collection. Such an apparent failure of memory, however, does not necessarily call a witness's truthfulness into question — it merely invites, but does not compel, the factfinder to discount the witness's credibility. Upon considering Sergeant Charron's testimony and his overall demeanor, the district court elected not to do so. Under these circumstances, we cannot disturb a credibility judgment that lies squarely within the province of the district court.

In light of these factual findings, which were not clearly erroneous, the district court reasonably inferred that "Do Not Disturb" signs must not have been placed on the doors of rooms 316 and 320, because the cleaning staff otherwise would not have entered these rooms and collected their trash. It follows that Defendant had no reasonable expectation of privacy in this trash, as he and his travel companions had placed items in the trash bins where they would be picked up during the routine daily cleaning of the rooms, and neither Defendant nor his companions had taken any

measures to prevent this typical daily task.[7] Consequently, we affirm this aspect of the district court's ruling on Defendant's motion to suppress.

### 2. The First Search Warrant Was Sufficiently Specific and Was Lawfully Executed.

Apart from claiming that the first warrant to search the hotel rooms did not rest upon a proper showing of probable cause because of its reliance upon items found in the trash, Defendant challenges both the language and the execution of this warrant. Specifically, he contends that the warrant was vague and overbroad in its grant of authority to search the hotel rooms for "papers showing ownership and/or control of" illegal narcotics. In addition, Defendant argues that the searches of the rooms exceeded any permissible reading of this language. We find no error in either regard.

"It is well settled that items to be seized pursuant to a search warrant must be described with particularity to prevent the seizure of one thing under a warrant describing another." *United States v. Blair*, 214 F.3d 690, 697 (6th Cir.) (internal quotation marks and citations omitted), *cert. denied*, 531 U.S. 880 (2000). Yet, this requirement of specificity "must be flexible, depending upon the type of items to be seized and the crime involved." *Blair*, 214 F.3d at 697. In particular, where a warrant adequately describes "a category of seizable papers," it is not lacking in specificity merely "because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *United States v. Ables*, 167 F.3d 1021, 1034 (6th Cir.) (internal quotation marks and citation omitted), *cert. denied*, 527 U.S. 1027 (1999).

The first warrant to search the hotel rooms met these standards for particularity. The affidavit in support of this warrant set forth a number of grounds for Sergeant Charron's belief that evidence of illegal drug trafficking might be found in the rooms, including: (i) the hotel manager's report of the odor of burning marijuana in the hallway outside these rooms; (ii) the discovery of a partial marijuana cigarette and a hollowed-out cigar shell in the trash collected from the rooms; (iii) the payment in cash for a week's stay in the rooms; (iv) the discrepancies in the driver's licence used to rent the car being driven by Defendant and his travel companions; and (v) the different names used to rent the car and to register for the two hotel rooms. Given these indicia of probable cause to

---

[7] Alternatively, even if the district court had erred in concluding that "Do Not Disturb" signs had been placed on the doors, we believe that other considerations would have altogether eliminated any claimed privacy interest in the items discovered in the trash. First, there surely is a meaningful distinction between items placed in a trash receptacle, where cleaning staff presumably will collect them at some point, and items located in other portions of the room, where hotel personnel would not be expected to inspect or remove them. *Cf. United States v. Bass*, No. 01-1017, 2002 WL 1378219, at *2 (6th Cir. June 24, 2002) (observing that hotel staff generally have no authority to enter a guest's room "except for housekeeping purposes," unless the guest consents or his tenancy has terminated). At a minimum, the Blue Ash police could have relied upon the apparent authority of the hotel cleaning staff to collect the trash from guest rooms, particularly where the police in this case have testified without contradiction that they directed the staff not to collect the trash if a "Do Not Disturb" sign was found on the door. *See Illinois v. Rodriguez*, 497 U.S. 177, 186-89, 110 S. Ct. 2793, 2800-01 (1990) (holding that the police may rely on consent given by someone who is reasonably believed to have authority over the premises).

In addition, Defendant confronts the problem that he registered as a guest in one room (316) and then apparently stayed in the other (320), thereby weakening his claim to privacy in either room. Any expectation of privacy was further diminished by Defendant's use of an alias, as the courts have recognized in cases where hotel rooms were obtained under a false name or with false documents. *See, e.g., United States v. Cunag*, 386 F.3d 888, 894-95 (9th Cir. 2004); *United States v. Carr*, 939 F.2d 1442, 1446 (10th Cir. 1991); *see also United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (citing *Carr* with approval). Under the combined weight of these considerations, we do not believe that Defendant had a reasonable expectation of privacy in the items collected from the trash receptacles of rooms 316 and 320.

search the rooms for evidence of drug trafficking,[8] the warrant was appropriately limited to the search and seizure of illegal drugs, papers "showing ownership and/or control" of such drugs, articles used in the preparation of such drugs for distribution, and any proceeds realized from such distribution. Viewed in the context of the suspected illegal activity (drug trafficking) and the other items to be seized (illegal drugs, articles used to prepare drugs for distribution, and drug proceeds), we find that the warrant adequately described a particular category of papers to be seized — namely, those "showing ownership and/or control of" illegal drugs.

To be sure, this authorization necessarily entailed a cursory review of any papers found in the hotel rooms to determine whether they reflected ownership or control of illegal drugs. As noted, however, a warrant is not rendered fatally overbroad merely because "the officers executing the warrant must exercise some minimal judgment" in order to determine whether a document lies within the category specified in the warrant. *Ables,* 167 F.3d at 1034 (internal quotation marks and citation omitted). Defendant has not pointed to any evidence that the officers executing the warrant erred in this judgment as they searched the room for the specified papers and other items. To the contrary, the record reveals that the officers did not seize any papers during this search.

Nonetheless, in challenging the execution of the first warrant, Defendant suggests that the officers must have acted beyond their limited authority, as they purportedly searched in places where they had no reason to look and obtained information beyond what could be gleaned from a cursory review of the documents found in the room. Regarding the former, Defendant observes that the police found certain documents in an envelope discovered inside a garment bag,[9] and he suggests that this is indicative of an overly broad search. Yet, it cannot be said that the garment bag was a place in which papers would not be found — and, indeed, papers *were* found in the bag. Plainly, then, the officers were entitled to look in this luggage for any papers that were subject to seizure under the warrant. *See United States v. Hare,* 589 F.2d 1291, 1294 (6th Cir. 1979).

Just as clearly, the officers were entitled — and, in fact, obligated — to review any papers they found during the search, at least to the extent necessary to determine whether they "show[ed] ownership and/or control" of illegal drugs. Defendant surmises that the officers must have exceeded this limited review, because they otherwise could not have obtained all of the information cited in the application for the second search warrant — namely, that various driver's licenses and credit cards were discovered in the rooms with names different from the ones under which the rooms were registered. All of this incriminating information, however, would have been readily apparent on the face of these items, without the need for any particularly close scrutiny — as noted in the application for the second warrant, for example, the officers discovered two driver's licenses with Defendant's picture but two different names, neither of which he gave when renting the rooms. Under the "plain view" doctrine, the officers could have seized any such incriminating evidence they discovered while executing the first warrant. *See United States v. Blakeney,* 942 F.2d 1001, 1028 (6th Cir.), *cert. denied,* 502 U.S. 1008 (1991); *Hare,* 589 F.2d at 1293-94. Likewise, they were free to cite this evidence as providing probable cause for the issuance of the second warrant, which in turn authorized them to seize these items as evidence of a violation of Ohio's forgery laws. Accordingly, we find no defect in the language or execution of the first warrant that would mandate the suppression of the evidence discovered during this search.

---

[8] Notably, apart from his contention that the items found in the hotel room trash should have been disregarded as the fruits of an unlawful search and seizure, Defendant does not challenge the district court's finding that the warrant was supported by probable cause.

[9] As noted by the district court, this garment bag belonged to Defendant's travel companion, Dennis Ritter. Nonetheless, we, like the district court, will assume for present purposes that Defendant has standing to challenge the search of this bag.

**B.    The District Court Properly Applied a Two-Level Enhancement for Obstruction of Justice.**

As his next issue on appeal, Defendant argues that the district court erred in applying a two-level sentence enhancement for obstruction of justice, based upon the court's finding that Defendant misrepresented his citizenship to a probation officer during the presentence investigation. To the extent that this enhancement rested upon the district court's interpretation of the sentencing guidelines, we review this decision *de novo*. *United States v. Burke*, 345 F.3d 416, 428 (6th Cir. 2003), *cert. denied*, 124 S. Ct. 1731 (2004). The district court's factual findings in support of this enhancement, however, are reviewed for clear error. *Burke*, 345 F.3d at 428. More generally, we must "give due deference to the district court's application of the guidelines to the facts." *United States v. Charles*, 138 F.3d 257, 266 (6th Cir. 1998) (internal quotation marks and citations omitted).[10]

The district court made the challenged two-level enhancement pursuant to U.S.S.G. § 3C1.1, which provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

The commentary for this guideline indicates that an enhancement is appropriate when a defendant "provid[es] materially false information to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1, cmt. n.4(h). The commentary further states, however, that an enhancement ordinarily is not warranted if a defendant "provid[es] incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation." U.S.S.G. § 3C1.1, cmt. n.5(c). "Material" information is defined as "information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. n.6.

In this case, the district court found that Defendant had obstructed justice within the meaning of § 3C1.1 by making a false statement to a probation officer regarding his citizenship. (*See* 1/17/2003 Sentencing Hearing Tr. at 16-19, J.A. at 51-54.) Specifically, Defendant stated during a presentence investigation interview that he was a citizen of Bermuda until he became a naturalized United States citizen in 1991. He then recanted this claim, however, when the probation officer confronted him with a 1993 document in which he acknowledged that he was an alien who was being released from the custody of the Immigration and Naturalization Service ("INS") until he could be deported. Upon being shown this document, Defendant changed his story and claimed to be a citizen of Bermuda. As noted by the probation officer, however, Defendant's true citizenship remains a mystery, in light of a determination by the British government that Defendant was not a

---

[10] We recognize that under *United States v. Booker*, __ S. Ct. __, 2005 WL 50108 (U.S. Jan. 12, 2005), it is no longer mandatory that defendants be sentenced in accordance with the United States Sentencing Guidelines. Sentencing courts must, however, give consideration to the guidelines. *See Booker*, 2005 WL 50108, at *27 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). Thus, it remains an important part of our appellate review function to determine what the guidelines would call for under the particular facts and circumstances of a given case. We then return below to the broader question of *Booker's* impact upon this appeal.

citizen of Bermuda, and in light of Defendant's inability to produce any documentation verifying his citizenship.[11]

While conceding that his claim of U.S. citizenship was false, Defendant argues that this misstatement was not "material" within the meaning of § 3C1.1 and its commentary. Defendant notes that this statement was made and recanted within the course of a single presentence investigation interview, and that this matter was resolved over three months before the final presentence investigation report was released. Under these circumstances, Defendant contends that his false claim of U.S. citizenship did not significantly impede the probation officer's investigation into his background and preparation of a report.

We find no error in the district court's determination that Defendant provided materially false information to the probation officer, thereby warranting a two-level enhancement under § 3C1.1. Initially, we reject Defendant's proposed "no harm, no foul" gloss upon this guideline, under which a defendant would be free to provide materially false information without penalty so long as the probation officer is able to promptly establish that the information is false. The guideline, after all, is triggered by either actual or "attempted" obstructions of justice, indicating that the proper focus is on the defendant's conduct rather than the probation officer's success in conducting a presentence investigation despite the misinformation provided by the defendant.[12] Likewise, the commentary accompanying this guideline emphasizes that information is "material" where, "*if believed*, [it] would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. n.6 (emphasis added). It follows, therefore, that the guideline is applicable even though a probation officer might not have believed the defendant's false assertion or, as here, was able to quickly disprove it.

Moreover, we believe that Defendant has somewhat understated the extent to which his false statement of his citizenship impaired the presentence investigation in this case. Defendant suggests that he made only a false claim of U.S. citizenship, and that, when confronted with information refuting this contention, he promptly identified himself as a citizen of Bermuda. Defendant continues to adhere to this latter claim, and he notes that it has never been conclusively disproved. In Defendant's view, then, his initial interview with the probation officer provided all of the information needed to conduct a thorough presentence investigation, and his false claim of U.S. citizenship did not materially impede this process.

Yet, this overlooks the considerable information uncovered by the probation officer that casts doubt upon Defendant's status as a citizen of Bermuda. In particular, the presentence investigation report cites the conclusion of the British government and of Interpol London that Defendant was *not* a citizen of Bermuda, and that he instead was born in Nigeria under the name of Joseph Ekwensi. Defendant did nothing to dispel this uncertainty, confirming that he had used this name as an alias,

---

[11] According to the presentence report, the International Criminal Police Organization ("Interpol") in London concluded in 1991 that Defendant's real identity was Joseph Nnandi Ekwensi, and that he was born in Nigeria in 1965. (*See* Presentence Investigation Report at 6, J.A. at 168.) During an interview with the probation officer, Defendant admitted that he was convicted of two 1988 offenses in England under this alias, but he denied that this was his true name or that he was born in Nigeria.

[12] Defendant cites our decision in *United States v. Williams*, 952 F.2d 1504, 1515-16 (6th Cir. 1991), for the proposition that § 3C1.1 encompasses only successful efforts to impede an investigation. We have previously rejected this proposed reading of *Williams*, however, explaining that the ruling in that case was limited to the context of false statements made to law enforcement officers during the investigation or prosecution of the charged offense. *See United States v. Aideyan*, 11 F.3d 74, 76 (6th Cir. 1993). Citing the commentary to § 3C1.1, we held in *Aideyan* that a false statement to a probation officer triggers an enhancement so long as it is "material," without regard for whether it actually operates as a "significant impediment" to the probation officer's investigation. *Aideyan*, 11 F.3d at 76.

and failing to provide any documentation to support his claim of Bermudian citizenship. More importantly, he had already demonstrated, through his false claim of U.S. citizenship, that he could not be relied upon for accurate information about his identity and background. As a result, the probation officer completed the presentence investigation without ever being able to ascertain Defendant's true citizenship.

Under these circumstances, we readily affirm the district court's conclusion that an enhancement under § 3C1.1 was warranted. As correctly observed in the court below, a false statement about citizenship, like misinformation bearing upon other aspects of a defendant's identity, impairs the ability of a probation officer to fully and accurately determine a defendant's criminal history and discover other pertinent background information. For this reason, this and other courts have held that a § 3C1.1 enhancement is appropriate where a defendant provides false identifying information to a probation officer during a presentence investigation. *See United States v. Wilson*, 197 F.3d 782, 785-86 (6th Cir. 1999); *see also United States v. Thomas*, 11 F.3d 1392, 1400-01 (7th Cir. 1993) (holding that "false information regarding the defendant's identity was clearly material because it thwarted the probation officer from investigating the defendant's personal and criminal history, which are major factors in determining a defendant's sentence"). We see no meaningful distinction, in terms of materiality to a presentence investigation, between the use of a false name and a false statement of citizenship — and, indeed, the facts here demonstrate that the two may be related, where the probation officer uncovered information casting doubt on both Defendant's citizenship and his true name. Accordingly, we affirm the district court's application of a two-level enhancement under U.S.S.G. § 3C1.1 in determining Defendant's sentence.

### C.    The District Court Did Not Err in Denying a Downward Adjustment for Acceptance of Responsibility.

Defendant next argues that the district court erroneously denied him a downward sentencing adjustment for acceptance of responsibility. Specifically, in light of his guilty plea, and in light of the Government's recommendation in his plea agreement that he "be given the appropriate reduction for acceptance of responsibility," (Plea Agreement at ¶ 5, J.A. at 32), Defendant contends that he was entitled to the two-level decrease called for under U.S.S.G. § 3E1.1. We affirm the district court's contrary conclusion.

As explained in the application notes accompanying § 3E1.1, "[c]onduct resulting in an enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1, cmt. n. 4. Here, of course, the district court applied an enhancement for obstruction of justice under § 3C1.1, and we have affirmed this determination. Consequently, Defendant bears the burden of showing that this is an "extraordinary case[] in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." U.S.S.G. § 3E1.1, cmt. n. 4; *see also United States v. Harper*, 246 F.3d 520, 528 (6th Cir. 2001) (confirming that it is "the defendant's burden to demonstrate that his case is 'extraordinary' such that he deserves the downward adjustment"), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002). Although this burden is not "insurmountable," *Harper*, 246 F.3d at 528, the sentencing court's determination on this point "is entitled to great deference," because "the sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," U.S.S.G. § 3E1.1, cmt. n. 5.

We agree with the district court that Defendant has failed to identify anything extraordinary about this case that would warrant adjustments under both § 3C1.1 and § 3E1.1. Defendant's claim of acceptance of responsibility rests upon his guilty plea, the statement in his plea agreement reflecting his "voluntary and truthful admission to authorities of his involvement in the [charged] offense," (Plea Agreement at ¶ 5, J.A. at 32), and his written July 1, 2002 statement to the probation officer admitting his unlawful conduct and apologizing for his actions. As Defendant points out, the application notes accompanying § 3E1.1 cite the "truthful[] admi[ssion] [of] the conduct comprising

the offense(s) of conviction" as a relevant consideration in determining whether to grant a reduction for acceptance of responsibility. U.S.S.G. § 3E1.1, cmt. n. 1(a). Because he has consistently admitted to the conduct alleged in count one of the indictment, the charge to which he pled guilty, Defendant argues that this factor warrants a reduction for acceptance of responsibility.

Yet, all of the acts cited by Defendant as evidencing his acceptance of responsibility flow naturally from, or are closely related to, his election to plead guilty to the offense charged in count one of the indictment. "[W]e require something more, as a matter of law, than a guilty plea . . . to demonstrate that the defendant's case is 'extraordinary.'" *Harper*, 246 F.3d at 528. In one case that we deemed "extraordinary," for example, all of the defendant's "obstructive conduct predated his indictment," the defendant "never denied his own responsibility and guilt," he "cooperated with prison officials" even "before he was ever charged with an offense," and he acted promptly to undo the effects of his obstructive conduct. *United States v. Gregory*, 315 F.3d 637, 640-41 (6th Cir.), *cert. denied*, 540 U.S. 858 (2003).

Here, in contrast, the actions reflecting Defendant's acceptance of responsibility are far more limited, and he provided little or no assistance in reversing the harmful effects of his obstructive conduct. Following his guilty plea and the corresponding admission of his involvement in the bank fraud offense charged in count one of the indictment, Defendant hindered the probation officer's presentence investigation by falsely claiming to be a U.S. citizen. Although he promptly retracted this claim upon being confronted with evidence disproving it, Defendant never provided any documentary evidence or other assistance in the probation officer's effort to confirm his subsequent claim of Bermudian citizenship. There is nothing in the record, in other words, that would remove the taint that arose from Defendant's false statement during the presentence investigation. Under these circumstances, we find no error in the district court's determination that "this case does not present an extraordinary occasion where the Defendant should get an acceptance of responsibility reduction despite the fact that he obstructed justice." (Judgment at 8, J.A. at 24.)

D. **The Government Did Not Breach the Plea Agreement by Failing to Affirmatively Recommend at Sentencing that Defendant Be Given a Reduction for Acceptance of Responsibility.**

As his final issue on appeal, Defendant argues that the Government breached an obligation owed under the parties' plea agreement by failing to recommend at the sentencing hearing that he be given a reduction for acceptance of responsibility. Because Defendant did not raise this objection at sentencing, we review only for plain error. *United States v. Barnes*, 278 F.3d 644, 646 (6th Cir. 2002). "When reviewing a claim under a plain error standard, this Court may only reverse if it is found that (1) there is an error; (2) that is plain; (3) which affected the defendant's substantial rights; and (4) that seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Barnes*, 278 F.3d at 646.

The starting point of our analysis is the language of the plea agreement itself, which provides in relevant part:

> In consideration of the defendant's voluntary and truthful admission to authorities of his involvement in the instant offense, the United States Attorney for the Southern District of Ohio recommends that the defendant be given the appropriate reduction for acceptance of responsibility, pursuant to United States Sentencing Guideline § 3E1.1(a).

(Plea Agreement at ¶ 5, J.A. at 32.) Defendant acknowledged his understanding, however, that "after investigation and review, the Court may determine that the . . . recommendations as outlined

previously are not appropriate and is not obligated to accept such," and that, "[i]n that event, . . . he shall not have the right to withdraw his guilty plea." (*Id.* at ¶ 6.)

In light of this plain language, we readily conclude that the Government did not breach the terms of the plea agreement by failing to affirmatively recommend at the sentencing hearing that Defendant be given a reduction for acceptance of responsibility. First, and most importantly, we note that the agreement did not require the Government to make such a recommendation at sentencing. Rather, the agreement itself included the requisite recommendation, without any stipulation that the Government would recite this term of the agreement on the record at sentencing or at any other hearing. Upon signing the agreement, therefore, the Government fulfilled its obligation under the relevant provision, recommending that Defendant "be given the appropriate reduction for acceptance of responsibility," and leaving nothing more to be done at sentencing.

In this important respect, this case differs from *Barnes*, the decision upon which Defendant chiefly relies on appeal. Under the plea agreement at issue in *Barnes*, the Government "agree[d] to recommend that the Defendant be sentenced at the low end of the applicable sentencing guideline range." *Barnes*, 278 F.3d at 650 (Suhrheinrich, J., dissenting) (quoting plea agreement). Yet, the Government failed to actually make the promised recommendation on the record at sentencing. Under these circumstances, we found that the Government had "fail[ed] to adhere to the letter of the plea agreement by expressly recommending that Defendant be sentenced at the low end of the guidelines at sentencing." *Barnes*, 278 F.3d at 649.

Here, in contrast, the "letter of the plea agreement" did not call for the Government to make such an express recommendation at sentencing — instead, the agreement itself set forth the Government's recommendation. At most, then, the plea agreement could perhaps be viewed as ambiguous on this subject, suggesting only by implication that the Government would voice its recommendation at sentencing. Under the standard of review that governs here, however, such an ambiguity could not trigger a "plain" error — that is, an error that is "clear" or "obvious" under current law, *see United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993) — which, if uncorrected, would seriously affect the fairness and integrity of Defendant's sentencing. *See United States v. Cogley*, No. 00-4031, 2002 WL 475259, at *4 (6th Cir. Mar. 27, 2002) (distinguishing *Barnes* as involving a "manifest" failure to adhere to the terms of a plea agreement, as opposed to a dispute over "two plausible interpretations of the language of" an arguably ambiguous plea agreement).

Moreover, it is important to note the precise scope of the Government's obligation under the plea agreement — namely, to recommend "that the defendant be given ***the appropriate reduction*** for acceptance of responsibility." (Plea Agreement at ¶ 5, J.A. at 32 (emphasis added).) The agreement further emphasized that the district court was not bound by this recommendation, and that, "after investigation and review, the Court may determine that the . . . recommendations as outlined previously are not appropriate." (*Id.* at ¶ 6, J.A. at 6.) The agreement made clear, in other words, that the appropriateness of any reduction for acceptance of responsibility would depend in part upon the outcome of the presentence investigation and the district court's review of the probation officer's findings.

Here, of course, Defendant's failure to obtain a reduction for acceptance of responsibility was due solely to his own conduct during the presentence investigation. At the time the parties signed the plea agreement, the Government recommended that Defendant be given "the appropriate reduction" for acceptance of responsibility in light of his "voluntary and truthful admission to authorities of his involvement in the instant offense." (Plea Agreement at ¶ 5, J.A. at 32.) If nothing further had occurred, and if Defendant had been truthful and forthcoming during the presentence investigation, he likely would have received the recommended reduction. Such a reduction was no longer "appropriate," however, in light of Defendant's false claim of U.S. citizenship during an

interview with the probation officer. Both the Government's recommendation and its underlying basis remained intact — namely, that Defendant initially was eligible for a sentence reduction because of his admission that he had committed the charged offense — but a change in circumstances, attributable exclusively to Defendant, made this reduction no longer "appropriate."[13]

Consequently, we find no error, plain or otherwise, in the Government's failure to recommend at sentencing that Defendant receive a reduction for acceptance of responsibility. The plea agreement did not impose such an obligation, and such a reduction was no longer appropriate in light of Defendant's actions after he signed the agreement and entered his guilty plea pursuant to this agreement. The Government complied with its obligations under the plea agreement, and only Defendant's own subsequent conduct prevented him from realizing the full benefit of the bargain he struck under this agreement.

E.    **The Impact of the Supreme Court's Ruling in *Booker***

To this point, we have addressed Defendant's challenges to the district court's application of the U.S. Sentencing Guidelines under the standards adopted by this court and others over the past two decades for reviewing such sentencing issues. This entire body of law has been cast in a different light, however, by the Supreme Court's very recent decision in *United States v. Booker*, __ S. Ct. __, 2005 WL 50108 (U.S. Jan. 12, 2005). To oversimplify a dramatic and far-reaching decision, *Booker* holds, in a two-part opinion issued by two separate 5-4 majorities, (i) that the Sixth Amendment as construed in *Blakely, supra,* applies to the federal sentencing guidelines, and (ii) that, in order to avoid the Sixth Amendment concerns raised by the guidelines, it is necessary to invalidate two provisions of the Sentencing Reform Act of 1984 that make the guidelines mandatory in federal court sentencing. *See Booker*, 2005 WL 50108, at *15, *24. In addition, the Court expressly confirmed that its holdings apply to all cases now on direct review. *See* 2005 WL 50108, at *29. Our task, therefore, is to assess the impact of these rulings upon the present appeal.

Under the first prong of *Booker*, our analysis of the constitutionality of Defendant's 33-month sentence is fairly straightforward. In accordance with the usual pre-*Booker* sentencing practice — and, in particular, the statutory command that the sentencing guidelines were mandatory, *see* 18 U.S.C. § 3553(b) — the district court found by a preponderance of the evidence that Defendant was subject to an enhancement under U.S.S.G. § 3C1.1 for obstruction of justice, resulting in a two-level increase from 12 to 14. At an offense level of 12 and a criminal history category of IV, Defendant would have faced a sentencing range of 21 to 27 months of incarceration. With an offense level of 14 following the two-level obstruction-of-justice enhancement, however, Defendant faced an increased sentencing range of 27 to 33 months, and the district court sentenced him at the top of this range.

Because the district court believed that the guidelines were mandatory, this 33-month sentence seemingly ran afoul of the rule stated at the conclusion of the first portion of the Supreme Court's *Booker* decision: namely, that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 2005 WL 50108, at *15. Absent the factual findings that triggered an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1, Defendant faced a maximum sentence of 27 months under

---

[13] Even if the Government had promised to affirmatively and expressly recommend a reduction at sentencing, Defendant's conduct during the presentence investigation arguably would have relieved the Government of this obligation. *See United States v. Skidmore*, 998 F.2d 372, 375-76 (6th Cir. 1993) (observing that "a defendant's failure to fulfill the terms of a pretrial agreement relieves the government of its reciprocal obligations under the agreement" (internal quotation marks and citations omitted)). Because we do not construe the plea agreement as embodying such a promise, however, we need not resolve this issue.

the federal sentencing guidelines. Although Defendant apparently does not dispute at least some of the facts underlying the § 3C1.1 enhancement — in particular, he has not challenged the probation officer's assertion that he falsely claimed U.S. citizenship during the presentence investigation — he does contest the probation officer's overarching conclusions that he concealed his citizenship and that his true citizenship remained unknown. To treat the guidelines as compelling a sentence enhancement on the basis of the district court's resolution of these disputed factual issues would contravene Defendant's Sixth Amendment right to insist that a jury find all such facts beyond a reasonable doubt.[14]

Nonetheless, we review any such violation under the plain error standard, because Defendant failed to raise any objection in the court below concerning (i) the mandatory character of the guidelines, or (ii) the district court's authority to find facts by a preponderance of the evidence that would result in sentence enhancements. *See United States v. Bartholomew*, 310 F.3d 912, 926 (6th Cir. 2002); *United States v. Stewart*, 306 F.3d 295, 312-13 (6th Cir. 2002); *see also Booker*, 2005 WL 50108, at *29 (emphasizing that "we expect reviewing courts," in applying the Court's decision, to decide whether the relevant Sixth Amendment issue "was raised below and whether it fails the 'plain-error' test"). Accordingly, we apply the four-part test set forth earlier, under which we may vacate Defendant's sentence only if it rests upon (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Bartholomew*, 310 F.3d at 926.

Although the district court's error in enhancing Defendant's sentence only became apparent with the decision in *Booker*, both the Supreme Court and this court have recognized that the first two prongs of the plain error standard are satisfied so long as the error is evident at the time of appellate consideration. *See United States v. Cotton*, 535 U.S. 625, 632, 122 S. Ct. 1781, 1785-86 (2002); *United States v. Cleaves*, 299 F.3d 564, 568 (6th Cir. 2002). Regarding the "substantial rights" element of the plain error analysis, we follow the lead of other courts and leave this issue unresolved, *see, e.g., Cotton*, 535 U.S. at 632-33, 122 S. Ct. at 1786; *Cleaves*, 299 F.3d at 568, because any error here did not seriously affect the fairness, integrity, or public reputation of judicial proceedings.

In reaching this conclusion, we find considerable guidance in the decisions that have applied the plain error standard to claimed violations of the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000). Indeed, *Booker* is a direct lineal descendant of *Apprendi* and *Blakely*, with each of these cases further defining the respective roles of judge and jury under the Sixth Amendment. Surely, then, the reasoning that we and other courts have employed in conducting plain-error review of claimed *Apprendi* violations should carry over to the present context of a claimed violation of *Booker*. In particular, both the Supreme Court and this Court have held that an *Apprendi* violation does not satisfy the fourth prong of the plain error standard if the evidence bearing upon the issue that was impermissibly decided by the judge rather than the jury was "overwhelming" and "essentially uncontroverted." *Cotton*, 535 U.S. at 633, 122 S. Ct. at 1786

---

[14] We note that the district court's factual findings in support of the § 3C1.1 enhancement concerned only matters that transpired *after* Defendant entered his guilty plea, and not any events or circumstances surrounding the substantive offenses charged in the indictment. As Justice O'Connor observed in dissent in *Blakely*, such facts are not discoverable prior to trial, and "substantial and real" costs would be incurred if a jury were required to determine such facts beyond a reasonable doubt in order to use them at sentencing. *See Blakely*, 124 S. Ct. at 2546 (O'Connor, J., dissenting). Nonetheless, the *Blakely* majority expressly declined to exclude such facts from the reach of its ruling. *See Blakely*, 124 S. Ct. at 2539 & n.11. *Booker*'s Sixth Amendment holding, likewise, draws no such distinction among categories of facts that may permissibly be found by a judge versus a jury. *See Booker*, 2005 WL 50108, at *15. Indeed, the sentence of defendant Booker himself had been enhanced under § 3C1.1 for obstruction of justice (albeit for trial testimony that the district court found perjurious), *see United States v. Booker*, 375 F.3d 508, 509 (7th Cir. 2004), and the Supreme Court affirmed the Seventh Circuit's ruling that this mandatory guideline-driven enhancement violated the Sixth Amendment, *see Booker*, 2005 WL 50108, at *29. We believe, therefore, that *Booker* reaches the district court's use in this case of its own factual findings to trigger a mandatory § 3C1.1 enhancement.

(internal quotation marks and citation omitted); *see also Stewart*, 306 F.3d at 317-18; *Cleaves*, 299 F.3d at 569.

We find this reasoning applicable here. Regarding the false claim of U.S. citizenship to the probation officer, Defendant does not deny that he made such a claim, but instead argues that it was not "material" because he promptly retracted it. We already have explained why, in our view, U.S.S.G. § 3C1.1 and its accompanying commentary do not countenance such a "no harm, no foul" view of materiality. On the basis of this uncontroverted fact alone, then, an enhancement for obstruction of justice would have been warranted. Moreover, while Defendant asserts that his claim of Bermudian citizenship has never been disproved, this does not call into question the district court's findings that Defendant both concealed his citizenship (by falsely claiming to be a U.S. citizen) and impeded the probation officer's effort to determine his true citizenship (by failing to provide any supporting documentation for his subsequent claim of Bermudian citizenship, leaving the probation officer to choose between Defendant's bare word and information that refuted Defendant's status as a citizen of Bermuda). We view the evidentiary support for the district court's findings on these points as sufficiently "overwhelming" to defeat any claim that these findings "seriously affected the fairness, integrity, or public reputation of judicial proceedings."

Two other considerations buttress our conclusion on the fourth prong of the plain error standard. First, we view it as unlikely that the district court would have imposed a lower sentence if it had realized that the guidelines are advisory and not mandatory. Exercising its more limited discretion under the mandatory regime, the district court elected to sentence Defendant at the top of the applicable 27-to-33-month guideline range. Surely, if the district court was not inclined to impose a shorter sentence despite its power to do so within the guidelines' mandatory sentencing scheme, it would not have elected to reduce Defendant's sentence under a more open-ended advisory system.

Next, while *Booker* does not distinguish between offense-related conduct and other sentence-enhancing facts, we cannot help but believe that a judge's findings concerning obstructive conduct toward a probation officer during a court-ordered and judicially-supervised presentence investigation do not trigger the same "fairness" concerns as, say, a judge's determination that a defendant brandished a weapon during the commission of a crime. "United States probation officers serve as officers of the court," and "it is reasonable to view the United States Probation Office itself as a legally constituted arm of the judicial branch." *United States v. Reyes*, 283 F.3d 446, 455 (2d Cir. 2002) (internal quotation marks and citations omitted); *see also* 18 U.S.C. § 3602(a) (authorizing the federal district courts to appoint probation officers "within the jurisdiction and under the direction of the court making the appointment"); 18 U.S.C. § 3552(a) (providing that a "United States probation officer shall make a presentence investigation of a defendant . . . , and shall, before the imposition of sentence, report the results of the investigation to the court").

Thus, it surely is within the province of the district court to investigate and punish attempts to interfere with a probation officer's performance of duties owed to the court. It follows, in our view, that the district court's factual findings on such matters are entitled to considerable deference. Although *Booker* instructs that such facts cannot trigger a sentence beyond the otherwise-applicable maximum unless they are admitted by the defendant or proved to a jury beyond a reasonable doubt, we cannot conceive that a district court's assumption of this fact-finding role, even if erroneous, could be viewed as "seriously affecting the fairness, integrity, or public reputation of judicial proceedings," as would be necessary to warrant reversal under the plain error standard. Consequently, we hold that any violation of *Booker* in this case does not require a remand for resentencing.

## IV. *CONCLUSION*

For the reasons set forth above, we AFFIRM the conviction and sentence of Defendant/Appellant Floyd Bruce.

---
**CONCURRENCE**
---

COOK, Circuit Judge, concurring. Though I join the majority in affirming Bruce's conviction and sentence, I respectfully decline to join its discussion of Bruce's expectation of privacy in his hotel-room trash because that theoretical constitutional question—whether a search by state actors rather than the hotel staffers would have violated a reasonable expectation of privacy—ought to be avoided as not "absolutely necessary to [the] decision of the case." *Watters v. TSR, Inc.*, 904 F.2d 378, 380 (6th Cir. 1990).

I agree with the majority regarding *Booker*'s impact here—plain-error review is appropriate. And we affirm Bruce's sentence because the district court's fact-finding—investigating and punishing attempted interference with a probation officer's performance of duties owed the court—did not seriously affect the proceedings' fairness, integrity, or public reputation. But while fact-finding under these circumstances, though violative of the Sixth Amendment, does not warrant resentencing under plain-error review, there may exist many circumstances under which unconstitutional judicial fact-finding *would*. I do not believe the majority intends to suggest otherwise, but the point deserves emphasis: unconstitutional judicial fact-finding may constitute plain error, but does not under these facts.